UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                    PLAINTIFF


v.                                             CRIMINAL NO. 3:25-CR-095-DJH


MATTHEW RYAN ELKINS                                         DEFENDANT


**UNITED STATES' SENTENCING MEMORANDUM**
*Electronically Filed*

The United States of America, by counsel, Assistant United States Attorney Erin G. McKenzie, files its memorandum in support of sentencing in this action currently scheduled for July 20, 2026. On April 20, 2026, Mr. Elkins entered a guilty plea to Counts 1-3 of the Indictment pursuant to a plea agreement under Rule 11(c)(1)(B). While the plea agreement contemplates a recommendation of a low-end guideline sentence, the applicable guidelines are in dispute.

**The Offense Conduct**

Mr. Elkins admitted to stealing pain medication from medically vulnerable patients over several months. The victims of his crime were cancer patients, palliative care patients, and patients with a history of brain or spinal injuries, failed back surgeries, or other severe disease. Beyond stealing prescribed medication from vulnerable patients who trusted him, Elkins also admitted to replacing the stolen medication with saline to avoid detection and protect access to his source of supply. While Mr. Elkins fed his own habit, his patients endured severe pain, confusion, and depression because they were consistently receiving heavily diluted medication. Many of these patients were also found to have been given medications that were not prescribed

to them thanks to Elkins' tampering. Following Elkins' arrest, his employer replaced the tampered and diluted medication with the actual prescribed medication, causing some patients to experience overdose reactions.

### Guideline Calculations

The United States agrees with the guideline calculation prepared by the United States Probation Office.  The total adjusted offense level is 30.

While the parties agree on the operative facts and most of the guideline calculations, they disagree on the applicability of an enhancement under §2N1.1(b)(1)(A)-(C). Elkins argues that patients who experienced narcotic overdoses in response to receiving undiluted medication did not experience life-threatening injury. Elkins goes further to argue that the severe pain experienced by nearly all of the patients receiving diluted medication is not severe enough to be considered "extreme pain" within the definition of serious bodily injury.

Under U.S.S.G. §2N1.1(b)(1), if a victim sustains "permanent or life-threatening bodily injury," a four-level increase applies. If a victim sustains "serious bodily injury," a two-level increase applies. If the injury is in between those two degrees, then a three-level increase is appropriate. §2N1.1(b)(1)(A)-(C).

### Permanent or Life-Threatening Bodily Injury

The guidelines define "permanent or life-threatening bodily injury" in the application notes to guideline §1B1.1. It means "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent."

Following Elkins' arrest in March 2024, the pain treatment center that employed him began dumping and refilling patient pain pumps to ensure patients received undiluted and

2

unadulterated medication. After months of receiving medication that was heavily diluted, patients were suddenly receiving schedule II narcotics in dosages and concentrations their bodies were not used to. Understandably, this caused severe reactions, disruptions and injury.

At least two patients described overdoses after finally receiving undiluted medication. For example, after months of her medicine feeling ineffective, PATIENT 2, a cancer patient, had a reaction so bad that she kept losing consciousness "because they gave me the right medicine." PATIENT 2 was unable to maintain consciousness in response to finally receiving medication that had been prescribed to her. To further aggravate the risk, PATIENT 2 tried to seek care from an emergency room and was told they could not deactivate her pain pump because she was under the care of the pain treatment center. SEALED EX. 2B at approx. 22:00.

In another example, PATIENT 4 recounted how her medication was ineffective for months and her pain was so severe she had to stop working. Then in late March 2024, in her own words, she got her pump refilled and "overdosed" on it. PATIENT 4 said she spent a weekend unable to stay awake, unable to "keep her eyes open", vomiting, and unable to get to the bathroom. Instead, PATIENT 4 said she just had to keep a towel between her legs to relieve herself. Similar to PATIENT 2, PATIENT 4 sought treatment from an emergency room and was referred back to the pain treatment center (which was not open on weekends).  SEALED EX. 4B at approx. 4:10.

These patients' descriptions of their experiences establish a preponderance of the evidence that finally receiving undiluted medication caused them to overdose. The parties (and entire community) are painfully aware of the risk of death posed by an overdose on opioids such as fentanyl and hydromorphone (Dilaudid)[1]. These are Schedule II drugs, which the DEA

---

[1] PATIENT 2 was prescribed hydromorphone (Dilaudid). PATIENT 4 was treated with fentanyl.

defines as "drugs with a high potential for abuse… (that are) also considered dangerous."

https://www.dea.gov/drug-information/drug-scheduling (last visited July 13, 2026).

The defendant correctly states the law in the 6th Circuit, which requires the Court to base

an enhancement "upon a particular result, not the defendant's conduct." *United States v. Perkins,*

89 F.3d 303, 308 (6th Cir. 1996). In this case, the "result" is that multiple patients overdosed on

dangerous narcotics after months of receiving heavily diluted drugs. The fact that those

overdoses did not culminate in death does not mean they did not carry a substantial risk of such.

*See United States v. Helton,* 32 Fed.Appx. 707, 716 (6th Cir. 2002) (stating "it is not necessary

that the injury actually cause death in order to cause a substantial risk of death").

### Serious Bodily Injury

The guidelines define "serious bodily injury" in the application notes to §1B1.1. It means

"injury involving **extreme physical pain** or the protracted impairment of a function of a bodily

member, organ, or mental faculty; or requiring medical intervention such as surgery,

hospitalization, or physical rehabilitation." (emphasis added).

At a minimum, Elkins' conduct resulted in serious bodily injury in that it caused extreme

physical pain. Elkins didn't deprive his victims of medicine needed to treat a cold or a headache.

These patients were able to be victimized by Elkins only because they live with chronic and/or

terminal illnesses that leave them in such states of constant pain that drug dispensing devices

have to be implanted in their bodies. Nearly every patient interviewed described periods of

extreme pain where their medication felt completely ineffective. *See* SEALED EXHIBITS 1-8.

PATIENT 4 went from being "an employee who never missed a day of work" to having to quit

her job because she was in so much pain. SEALED EX. 4B. Not receiving her medication had

such an effect PATIENT 1 that she had to be treated at the hospital. SEALED EX. 1A.

4

PATIENT 1 was in such severe pain she could not get to the bathroom and described laying on the floor and having to urinate on herself. SEALED EX. 1B.

Several other patients described the efficacy of their medication as "inconsistent," meaning sometimes they would get no relief at all from their medicine, and other times the same dose and concentration would make them feel "overmedicated" (SEALED EX. 8) or "on the nod" (SEALED EX. 3A at approx. 6:50). This caused PATIENT 3 to be unable to participate in her daughter's wedding. She could not even stand or eat. *Id.* and SEALED EX. 9D.

At a bare minimum, Elkins' conduct warrants a two-level enhancement under §2N1.1(b)(1)(B) for "serious bodily injury."

## Criminal History

The United States concurs with the criminal history calculation prepared by the United States Probation Office of a Criminal History Category I.

## Appropriate Sentence

This Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Title 18, United States Code, section 3553(a) guides the Court regarding factors to consider when imposing a sentence. That section directs courts to consider the following:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed–

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for--

       (A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines–

       . . .

(5)     any pertinent policy statement--

       . . .

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

In accordance with the parties' plea agreement, the United States recommends a sentence of imprisonment at the low end of the guideline range. While the defendant's family and community support are impressive, they do not mitigate the seriousness of his offenses.

The impact on victims discussed above cannot be overstated. In addition to the physical injuries, Elkins also caused severe psychic injuries to these patients which do not seem to be reflected anywhere in the guidelines. One victim impact statement describes how an 83-year-old patient now approaches "medical appointments with anxiety and fear, often questioning whether he can trust anyone in the healthcare system again." SEALED EX. 9A. Another patient writes they "once trusted my medical providers to care for me with integrity and compassion. Now I approach every medical appointment with apprehension and doubt, worried that my well-being may be compromised again. This loss of trust affects not only my physical recovery but also my mental and emotional health." SEALED EX. 9B.

One of the patients affected passed away prior to submitting an impact statement. A document prepared by an attorney for PATIENT 2 and shared with the United States, however, describes how she "suffered from severe narcotic withdrawal including shortness of breath, dizziness, nausea, multiple falls, anxiety, depression, and… pain levels (that) had increased to a

9 out of 10,". Further, that PATIENT 2 fell at least three times, with one fall knocking out a tooth. SEALED EX. 9C.

Another impact statement summarizes "…these medications were not a convenience—they were what allowed (patients) to get out of bed, care for their families, sleep through the night, or simply endure another day with some measure of dignity." SEALED EX. 9E. Elkins didn't just steal medication from medically fragile patients. He stole their trust in the healthcare system they are forced to depend on. He stole their dignity.

He also stole from his employer—the physician who operated the pain treatment center. He writes "it is difficult to describe the emotional weight of discovering that someone you trusted so completely was exploiting both your confidence and your patients' vulnerability." *Id.*

The defendant asks the Court to sentence below the applicable guideline range. The United States believes a downward variance would unduly depreciate the seriousness of the offenses and would fall short of just punishment for his crimes.

### Conclusion

The United States respectfully requests the Court to impose a sentence of imprisonment at the low end of the guideline range.

Respectfully submitted,

KYLE G. BUMGARNER
United States Attorney

Erin G. McKenzie
Assistant U.S. Attorney
717 West Broadway
Louisville, Kentucky  40202
PH:  (502) 582-5911

7

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel for the defendant.

Erin G. McKenzie
Assistant U.S. Attorney

8